UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TYRONE L. WIGGINS,

Petitioner,

CASE NO. 4:12-CV-11893

v.

JUDGE MARK A. GOLDSMITH

MAGISTRATE JUDGE PAUL J. KOMIVES

SHERRY BURT,

Respondent.[1]

_____/

# REPORT AND RECOMMENDATION

I.   RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
II.  REPORT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     A.   Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
     B.   Factual Background Underlying Petitioner's Conviction . . . . . . . . . . . . . . . . . . . . . 5
     C.   Procedural Default . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     D.   Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
     E.   Trial Court Errors (Claim III) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
          1.   Improper Admission of Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14
          2.   Limitation on Cross-Examination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
               a. Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16
               b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
          3.   Improper Comments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
               a. Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
               b. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
     F.   Prosecutorial Misconduct (Claim IV) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          1.   Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
          2.   Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
     G.   Ineffective Assistance of Counsel (Claims I & II) . . . . . . . . . . . . . . . . . . . . . . . . . 26
          1.   Clearly Established Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26
          2.   Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
               a. Impeachment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
               b. Leading Questions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
               c. Prosecutorial Misconduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
          3.   Appellate Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
               a. Sufficiency of the Evidence . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31
               b. Jury Instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33
               c. Ineffective Assistance of Trial Counsel . . . . . . . . . . . . . . . . . . . . . . . . 34
     H.   Recommendation Regarding Certificate of Appealability . . . . . . . . . . . . . . . . . . . . 34
          1.   Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

[1]By Order entered this date, Sherry Burt has been substituted for Willie Smith as the proper respondent in this action.

|   |   | 2. | *Analysis* | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 36 |
|   | I. |   | *Conclusion* | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 |
| III. |   |   | NOTICE TO PARTIES REGARDING OBJECTIONS | . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 37 |

*         *         *         *         *

I.      RECOMMENDATION: The Court should deny petitioner's application for the writ of habeas corpus and should deny petitioner a certificate of appealability.

II.     REPORT:

A.      *Procedural History*

1.      Petitioner Tyrone L. Wiggins is a state prisoner, currently confined at the Muskegon Correctional Facility in Muskegon Heights, Michigan.

2.      On November 5, 2007, petitioner was convicted of assault with intent to commit murder, MICH. COMP. LAWS § 750.83; two counts of assault with intent to commit great bodily harm, MICH. COMP. LAWS § 750.84; possession of a firearm by a felon, MICH. COMP. LAWS § 750.224f;  and possession of a firearm during the commission of a felony, MICH. COMP. LAWS § 750.227b, following a jury trial in the Wayne County Circuit Court.  On December 11, 2007, he was sentenced as a second habitual offender, MICH. COMP. LAWS § 769.10, to concurrent terms of 20-30 years' imprisonment for the assault with intent to commit murder conviction, 5-10 years' imprisonment for each of the other assault convictions, and 2-5 years' imprisonment for the felon in possession conviction.  Petitioner was also sentenced to a mandatory consecutive term of 2 years' imprisonment on the felony-firearm conviction.

3.      Petitioner appealed as of right to the Michigan Court of Appeals raising, through counsel, the following claim:

DEFENDANT-APPELLANT IS ENTITLED TO VACATION OF ONE OF THE TWO CONVICTIONS AGAINST HIM AS TO SAMUEL TARVER WHERE THE CONSTITUTIONAL PROVISION AGAINST OF [sic] DOUBLE JEOPARDY

2

WAS VIOLATED.

The court of appeals agreed with petitioner, and vacated one of the assault with intent to commit great bodily harm convictions.  The court otherwise affirmed petitioner's convictions.  *See People v. Wiggins*, No. 283158, 2009 WL 609413 (Mich. Ct. App. Mar. 10, 2009) (per curiam).

       4.       Petitioner, proceeding *pro se*, sought leave to appeal in the Michigan Supreme Court, raising the following claim:

> THE COURT OF APPEALS WERE ERRONEOUS WHEN THEY VACATED THE CHARGE OF ASSAULT WITH THE INTENT TO DO GREAT BODILY HARM, THIS IS THE CHARGE WHICH IS SUFFICIENTLY SUPPORTED.  THE CHARGE OF ASSAULT WITH INTENT TO MURDER IS A PRODUCT OF A[N] INSUFFICIENT AMOUNT OF EVIDENCE, WHERE THE PROSECUTION DID NOT MEET IT[S] BURDEN OF PROOF BEYOND A REASONABLE DOUBT. THEREFORE UNDER THE JACKSON STANDARD THE MICHIGAN COURTS VACATED THE INCORRECT CONVICTION.  VIOLATION OF U.S. CONST AM V, XIV.

The Supreme Court denied petitioner's application for leave to appeal in a standard order.  *See People v. Wiggins*, 484 Mich. 871, 769 N.W.2d 701 (2009).

       5.       Petitioner subsequently filed a motion for relief from judgment in the trial court pursuant to MICH. CT. R. 6.500-.508, raising the following claims (as stated in his application for leave to appeal):

> I.      DEFENDANT MR. WIGGINS WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL IN HIS FIRST APPEAL OF RIGHT, THUS RESULTING IN ACTUAL PREJUDICE AND A BREAKDOWN OF THE ADVISORY [sic] PROCESS, CONTRARY TO THE U.S. CONST. AMS VI, XIV.
>
> II.     DEFENDANT WAS DENIED HIS CONSTITUTIONAL RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL DURING HIS TRIAL PROCEEDINGS.
>
> III.    THE TRIAL COURT'S ABUSE OF DISCRETION DENIED DEFENDANT A FAIR TRIAL AND HIS RIGHT TO DUE PROCESS BY ERRING IN

HIS EVIDENTIARY RULINGS, INCLUDING FAILING TO GRANT DEFENDANT'S MOTION FOR DIRECTED VERDICT OF ACQUITTAL, MOTION FOR MISTRIAL, IMPROPER COMMENTS, PLACING LIMITATIONS UPON DEFENSE COUNSEL'S CROSS-EXAMINATION OF DEFENDANT'S WITNESS AND BY FAILING TO CONTROL THE TRIAL PROCEEDINGS AND THE PROSECUTOR'S MISCONDUCT, AND SEEING THAT DEFENDANT HAD A FAIR TRIAL.

IV.   THE PROSECUTOR'S ACTIONS DENIED THE DEFENDANT A FAIR TRIAL AND HIS DUE PROCESS RIGHTS UNDER THE MICHIGAN AND FEDERAL CONSTITUTIONS AND APPELLATE COUNSEL WAS INEFFECTIVE WHEN FAILING TO LITIGATE THIS ISSUE.

On August 10, 2010, the trial court denied petitioner's motion for relief from judgment, concluding that the claims were barred by petitioner's failure to raise them on direct appeal, MICH. CT. R. 6.508(D)(3). *See People v. Wiggins*, No. 07-013417-01-FC (Wayne County, Mich., Cir. Ct. Aug. 10, 2010). The Michigan Court of Appeals and Michigan Supreme Court denied petitioner's applications for leave to appeal in standard orders. *See People v. Wiggins*, 491 Mich. 885, 809 N.W.2d 574 (2012); *People v. Wiggins*, No. 303516 (Mich. Ct. App. Sept. 20, 2011).

6.     Petitioner, proceeding *pro se*, filed the instant application for a writ of habeas corpus on April 26, 2012. As grounds for the writ of habeas corpus, he raises the four claims that he raised in his motion for relief from judgment.[2]

7.     Respondent filed her answer on November 2, 2012. She contends that petitioner's second through fourth claims are barred by petitioner's procedural default in the state courts, and that all of his claims are without merit.[3]

_____

[2]Petitioner has not filed a brief in support of his petition, and his reply brief addresses only the procedural default issue. Therefore, in identifying and analyzing petitioner's claims, I rely on the briefs he filed in the state courts.

[3]Respondent also contends that the petition should be dismissed because petitioner failed to sign the petition as required by 28 U.S.C. § 2242 and Rule 2 of the Rules Governing Section 2254 Cases in the United States District Courts, Rule 2(c)(5), 28 U.S.C. foll. § 2254. "The district court may refuse to

8.      Petitioner filed a reply to respondent's answer on November 29, 2012.

B.      *Factual Background Underlying Petitioner's Conviction*

The evidence adduced at trial was briefly summarized by the Michigan Court of Appeals on

petitioner's direct appeal:

> Defendant's convictions stem from his assaults on Samuel and Malcolm
> Tarver. Defendant was dating the victims' sister, Kessa Tarver. Samuel and Malcolm
> drove to defendant's home, and defendant met Malcolm in the middle of the
> walkway. According to Malcolm, defendant "just snapped" and began to hit him
> with a gun. The gun discharged at least once as defendant hit Malcolm. Samuel left
> the truck and moved toward defendant and Malcolm. Defendant pointed the gun at
> Samuel, who started running away. Malcolm followed Samuel. As the two ran,
> defendant shot repeatedly at Samuel, striking him twice in the leg.

*Wiggins*, 2009 WL 609413, at *1.  The testimony at trial is more fully summarized in respondent's

Answer:

> Samuel Tarver was Malcolm Tarver's older brother. (11/1/07 Trial Tr. [II]
> at 4; 8/24/07 Preliminary Examination [PE] at 7.) Because Samuel was deceased by
> the time of trial, his preliminary examination testimony was read to the jury. (II at
> 60.)
> Malcolm knew Tyrone Wiggins through Wiggins' daughter, Tianna Wiggins.
> (II at 6.) In September of 2006, Malcolm thought that he had fathered Tianna's son,
> Harlem. (II at 6-7; PE at 19-20; 11/2/07 Trial Tr. [III] at 20, 70.) Wiggins lived with
> Tianna at Wiggins' mother's house. (II at 8; III at 72.) Wiggins was dating
> Malcolm's and Samuel's sister, Kessa Tarver. (II at 8; PE at 19; III at 43, 57, 71.)
> On September 22, 2006, Wiggins learned that his grandson, Harlem, had a
> gash on his eye. (III at 73.) Wiggins was upset. (III at 74.)
> Samuel had the day off of work, so he spent the day with Malcolm. (PE at 7.)
> They were at Wiggins' house. (PE at 7.) Samuel saw Wiggins at the house before
> they left. (PE at 7-8.)
> Malcolm testified that Kessa had called him and Samuel from Wiggins'
> house and told them that she wanted them to bring her something to eat. (II at 8, 9.)

---

file, or may dismiss, an unsigned and unverified petition. However, the defect is one that the district
court may, if it sees fit, disregard." *Hendricks v. Vasquez*, 908 F.2d 490, 491 (9th Cir. 1990); *see also, Hem
v. Maurer*, 458 F.3d 1185, 1201 n.6 (10th Cir. 2006) *Ferrara v. United States*, 456 F.3d 278, 295 (1st Cir.
2006).  Here, no purpose would be served by rejecting the application and requiring petitioner to file
a new, signed petition.

Samuel testified that Kessa and Malcolm had asked him to get them some food. (PE at 7.) Malcolm and Samuel got some food and took the food to Kessa at Wiggins' house. (II at 9; PE at 8.) Samuel was driving the car and Malcolm was the passenger; there was no one else in the car. (II at 9-10; PE at 17-18; III at 74.)

Kessa claimed that she was outside with Wiggins while they waited for Malcolm and Samuel to arrive with the food. (III at 44-45.) Kessa said that she asked for the food, but then stated that Samuel was the one who asked for something to eat. (III at 45.)

When they arrived back at Wiggins' house, Malcolm got out of the truck with the food and made it about halfway up the walkway. (II at 10; PE at 21.) Samuel saw Wiggins come out of the house. (PE at 8.) Wiggins had a big black gun in his hand and started hitting Malcolm with the gun. (II at 10, 11; PE at 8, 9.) Wiggins hit Malcolm two or three times on the left side of the head. (II at 11.) There was no verbal argument before Wiggins began hitting Malcolm. (II at 37-38, 49.)

Malcolm said that the gun went off once while Wiggins hit him in the head. (II at 17-18.) Samuel testified that Wiggins was shooting the gun while he hit Malcolm in the head with the gun. (PE at 8, 9, 11.) Malcolm recalled testifying at the preliminary exam that the gun went off about three times while Wiggins hit him in the head with it. (II at 42.) Samuel stated that the gun went off at least three times while Wiggins hit Malcolm in the head. (PE at 11-12.)

Samuel got out of the truck. (II at 10, 12.) Samuel walked around the truck toward where Wiggins was hitting Malcolm and asked what was going on. (II at 12; PE at 10, 23.) Wiggins walked toward Samuel and told Samuel that he did not have anything to do with it. (PE at 10, 24.) Samuel did not know what was going on, so he asked Wiggins again. (PE at 10.) Malcolm could not remember if Wiggins said anything because he was so scared. (II at 12-13.) Then Wiggins raised his hand with the gun in it like he was going to shoot Samuel. (II at 13.)

Wiggins pointed the gun toward Samuel. (II at 14.) Samuel saw Wiggins move around and saw the gun go up, with Wiggins pointing the gun right at him. (PE at 15.) Malcolm was about four feet away. (II at 13, 14; PE at 24.) Both Malcolm and Samuel started running. (II at 10-11, 15.) Malcolm stated that Samuel ran first, but Samuel stated that Malcolm ran first. (II at 15; PE at 23-24, 25, 26.) Samuel ran to the right toward the river, while Malcolm ran left in the opposite direction. (II at 15-16.) Samuel did not see Wiggins shoot at Malcolm while Malcolm ran. (PE at 25.)

Malcolm did not see what happened after that. (II at 21.) Malcolm ran toward his sister's house, which was across the corner about a block away, because he did not know anyone else in the neighborhood. (II at 8, 21; PE at 7.)

Immediately after Samuel ran, he heard the gunshots—at least eight shots. (PE at 16, 28.) Samuel was about 35 feet away from Wiggins when he was first shot. (PE at 13, 15.) Samuel was shot twice: one in the hip and one in the thigh. (PE at 12.) Samuel did not see Wiggins shoot the gun when he was shot. (PE at 14.) But at the time Samuel ran away, only the three of them were outside, and Wiggins had the gun in his hand. (PE at 14.) No one else was on the street.

6

Malcolm was so scared that he did not recall hearing the gun fire while he ran. (II at 18.) But Malcolm did recall that he told the police about an hour after the incident that he heard shots fired. (II at 20.) Malcolm testified that the gun firing while he was hit in the head was not the only shooting that he referred to when he spoke to the police. (II at 20.) Malcolm recalled testifying at the preliminary examination that he heard three shots while he was running. (II at 27.) Malcolm then stated that he heard some shots, two or three, while running. (II at 28.) Malcolm later testified that he heard shots while he and Samuel were running, but he did not remember how many shots he heard. (II at 31.)

Tianna watched her father and Malcolm from the house's doorway about four feet away. (III at 21-22, 23-24.) Tianna claimed that Malcolm and Wiggins had some words before they began "tussling." (III at 22.) And Samuel had "jumped" Wiggins and started fighting Wiggins with Malcolm. (III at 25.) Kessa stated that Malcolm and Wiggins were only arguing when Samuel approached them; then the fight broke out. (III at 46-47.) Then Wiggins' friend, "Hook," jumped up off of the porch. (III at 25-26.) Tianna saw a gun fall, saw Hook pick up the gun, and heard a shot. (III at 26.) Kessa saw the gun fall, and then Hook came up, picked up the gun, and started shooting. (III at 48-49.) Kessa thought she heard four shots. (III at 49.) After the shot, everyone ran, and Tianna shut the door, grabbed her child, and sat in the hallway. (III at 26-27, 49.) Tianna did not know where Kessa was at during the altercation. (III at 37.)

Kessa did not see how Wiggins left the scene. (III at 60.) But Kessa saw Hook get into a black car that had pulled up. (III at 50, 60.) Kessa saw her brother lying on the ground, called EMS, and waited with her brother. (III at 50.) Kessa claimed that she told her mother that Hook shot Samuel. (III at 57.)

Tianna claimed that her father, Wiggins, did not have a gun that day. (III at 27.) Kessa also did not see Wiggins with a gun that day. (III at 51.) And Kessa did not know if Samuel carried a gun that day. (III at 51.)

Inell Tarver, Samuel's, Kessa's, and Malcolm's mother, received a phone call on the 22nd from Kessa that Samuel was shot at the Samaritan Center. (III at 100.) When Inell went to the center, Samuel was not there. (III at 101.) She asked a guard and the lady at the desk about the shooting, but no shooting had happened there. (III at 101.) So Inell went to Kessa's house, but Kessa was not there. (III at 101-02.)

Kessa told her mother that she did not know who shot Samuel. (III at 102, 103.) Kessa never told Inell that Hook had shot Samuel. (III at 104.) When Kessa asked Inell to take her children, Kessa never mentioned that she knew who shot Samuel. (III at 104.)

Malcolm thought that Wiggins was angry with him that day because Harlem had a scratch over his left eye. (II at 32.) When Tianna picked up her son from Malcolm earlier that day, her son had a cut and a black eye. (III at 27-28.) Tianna told Wiggins about it, and Malcolm arrived just a few minutes later. (III at 28.) But Tianna never called protective services and never took her son to the doctor. (III at 30.) Malcolm did not cause the scratch over Harlem's eye. (II at 32, 37.)

Officer Jon Weiss responded to a shooting dispatch. When he arrived, Officer

7

Weiss saw Samuel lying on the sidewalk with pillows and blankets. (II at 61-62.) Samuel told Officer Weiss that he was in a lot of pain and that he saw the person who shot him get into a car and leave. (II at 62.) Officer Weiss then taped off the scene to preserve it until the evidence technicians arrived. (II at 62.) The officer recalled seeing shells. (II at 64-65.)

Tianna admitted that she did not come out and talk to the police when they arrived, even though they knocked on her door. (III at 34, 35.) Tianna never spoke to the police or told them that she witnessed the shooting, even though her father was arrested for the shooting. (III at 35-36.)

Officer James Fisher arrived at the scene and tried to question Samuel. (III at 106.) But Samuel was not talking. (III at 106.) Officer Fisher did not see Kessa there when Samuel was being worked on by the medics. (III at 106.) Kessa was at the corner, several houses away from where Samuel was shot, with a group of people. (III at 106, 107.) Officer Fisher spoke with Kessa. (III at 106.)

Kessa informed Officer Fisher that Samuel was her brother. (III at 107.) Officer Fisher took Kessa to his car to interview her. (III at 107.) Kessa told Officer Fisher that she was not there to witness the shooting. Kessa never mentioned that someone named Hook had shot Samuel. Kessa did not see anything. (III at 107.) Officer Fisher also stated that sometimes someone who is at a shooting would say that they did not see anything. (III at 110.)

The scene was already taped off when Officer Donald Rem, an evidence technician, arrived. (II at 66-67.) He spoke with the officer in charge and walked through the scene, taking pictures and sketching to document the evidence. (II at 67-68.) Officer Rem received information that there were several casings in front of Wiggins' house. (II at 68.) Officer Rem located two more casings about 40 to 50 feet south of the house. (II at 68.)

Officer Rem found five spent casings and one live round. (II at 69.) They were .40 caliber Smith and Wesson. (II at 76; III at 10.) The live round was located in front of Wiggins' house. (II at 70.) One spent casing was on the sidewalk in front of Wiggins' house, and another spent casing was near the curb in front of Wiggins' house. (II at 70-71.) A third spent casing was located in the street about 40 to 50 feet south of the other casings. (II at 71.) Two more spent casings were also found in the street, 40 to 50 feet south of the first casings. (II at 71, 72.) The casings covered an area of 60 feet. (III at 12.) Just by looking at the casings, Officer Rem could not tell if the shots were fired during a struggle over a gun, in self-defense, or who fired the shots. (III at 11-12.)

About an hour after he went to his sister's house, Malcolm went back to Wiggins' house because one of the officers had questions for him. (II at 21.) That is when Malcolm learned that Samuel was shot in the leg and on his way to the hospital. (II at 21-22.)

Malcolm visited Samuel in the emergency room. But Samuel was in pain and could not talk. (II at 22.) The bullets removed from Samuel's leg were .40 caliber. (PE at 9.) Two days later, Malcolm again visited Samuel at the hospital. Samuel could not talk because he was drugged up and kept waking up and falling asleep. (II

at 23-24.) Samuel was in the hospital for a week or two. (II at 24; PE at 16; III at 61.) Inell never saw Kessa at the hospital visiting Samuel. (III at 103.) When Samuel was released, he could not walk. (II at 24.) Samuel was in a wheelchair for three months. (II at 24; PE at 16.) After months of therapy, Samuel progressed to walking with the assistance of a cane or walker. (II at 24-25.) The scar was in his left upper hip area. (PE at 17.) A certified copy of Samuel's medical records was admitted into evidence without objection. (III at 12-13.)

Tianna never went to the police station to tell them that Hook, not her father, shot the gun. (III at 36.) Even after her father was formally charged, Tianna never informed the prosecutor's office that someone else shot the gun. (III at 36-37.)

After Wiggins was arrested, Kessa did not tell the police that Hook, not Wiggins, shot Samuel. (III at 58.) Kessa also did not go to the prosecutor's office to tell them that Hook shot Samuel. (III at 59.) Kessa did not try in any way to get Hook arrested for shooting her brother, even though she thought that they had the wrong man. (III at 60, 62.) Kessa claimed that she did not go to the police about Hook because she was concerned about the consequences of telling because "stuff happens" and she had six kids. (III at 63.) But then Kessa said that once she became incarcerated she was no longer afraid, even though her children go to school over in that neighborhood. (III at 64.) And even then, Kessa did not send a letter to the prosecutor's office or the police to even try to tell them that Hook shot Samuel. (III at 65, 66.)

Wiggins testified at trial. While Wiggins testified that he was upset about the injury to Harlem, he claimed that he was not angry. (III at 74.) But later Wiggins admitted that he was angry with Malcolm. (III at 82, 83, 84.) Then Wiggins claimed that he was not angry, just upset. (III at 86.) Wiggins also claimed that he did not call 9-1-1 to get Harlem medical treatment because everything happened so fast. (III at 82.) But Kessa testified that she was outside with Wiggins while they waited for Malcolm and Samuel to arrive with the food. (III at 44-45.)

Wiggins believed it was Malcolm's fault that Harlem was injured. (III at 84.)

When Samuel and Malcolm arrived, Wiggins walked down from the porch and questioned Malcolm about Harlem. (III at 74-75.) Wiggins stated that Malcolm was six-nine or six-ten tall. (III at 76.) Wiggins claimed that he only wanted to talk to Malcolm, but Malcolm "[s]welled up and got angry." (III at 75, 98-99.) Then Samuel got out, asking what was going on. Wiggins told Samuel, "You don't have anything to do with this. This is between him and me." (III at 75.) Then Malcolm grabbed Wiggins, and Samuel pushed Wiggins. (III at 75-76.) Wiggins testified that he was unsure who pushed who first. (III at 99.) Then Wiggins saw a gun fall, and Samuel reached for the gun. (III at 76-77.)

Wiggins claimed that he never owned a gun. (III at 77.)

Hook was sitting on the porch. (III at 77.) Wiggins had known Hook for five to six months, but he did not know Hook's actual name. (III at 77-78.) After the gun fell, Hook ran down and grabbed the gun. (III at 78.) Then Wiggins heard three shots. (III at 78.) Wiggins ran up the street and cut through a field. He ran until he saw someone he knew driving, so he got into the car and left the neighborhood. (III

9

at 78.) Wiggins did not return home until a couple days later. (III at 90.)

Wiggins ran, even though his friend, Hook, had come to help Wiggins and shot at the teen-agers beating Wiggins up. (III at 89.)

Wiggins said that he did not know if Hook ran too, but then Wiggins stated that Hook got into a black car and took off. (III at 89.)

Later that night or the next day, Wiggins learned that Samuel was shot. (III at 79.) When Wiggins saw himself flashed on the news, he turned himself in to the police. (III at 79.) Wiggins denied shooting at anyone. (III at 80.) The first person that Wiggins told that Hook had shot Samuel was Wiggins' trial attorney, a long time after the shooting. (III at 94, 96.)

The parties stipulated that Wiggins, a convicted felon, had not had his rights restored to carry a firearm. (III at 19.)

Answer, at 9-19.

C.    *Procedural Default*

Respondent contends that petitioner's second through fourth claims are barred by petitioner's procedural default in the state courts because he failed to raise these claims on direct appeal, and they were barred by the trial court on collateral review on this basis pursuant to MICH. CT. R. 6.508(D)(3).  Even if the claims are defaulted, however, it is necessary to consider the merits of petitioner's claims.  Petitioner asserts that appellate counsel rendered ineffective assistance in failing to raise these claims.  If petitioner's position is correct, counsel's ineffectiveness may constitute cause to excuse any procedural default.  *See Edwards v. Carpenter*, 529 U.S. 446, 451 (2000); *Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Consideration of counsel's effectiveness, however, depends in part on consideration of petitioner's underlying claims.  Given that the cause and prejudice inquiry merges with an analysis of the merits of petitioner's defaulted claims, it is better to simply consider the merits of these claims, even if they are defaulted.  *See Jamison v. Collins*, 100 F. Supp. 2d 647, 676 (S.D. Ohio 2000); *Watkins v. Miller*, 92 F. Supp. 2d 824, 832 (S.D. Ind. 2000); *cf. Strickler v. Greene*, 527 U.S. 263, 282 (1999) (considering merits of petitioner's habeas claims where inquiry into the merits mirrored cause and prejudice inquiry).

D.    *Standard of Review*

Because petitioner's application was filed after April 24, 1996, his petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996).  *See Lindh v. Murphy*, 521 U.S. 320, 326-27 (1997). Amongst other amendments, the AEDPA amended the substantive standards for granting habeas relief by providing:

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

"[T]he 'contrary to' and 'unreasonable application' clauses [have] independent meaning." *Williams v. Taylor*, 529 U.S. 362, 405 (2000); *see also*, *Bell v. Cone*, 535 U.S. 685, 694 (2002).  "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [this] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003) (per curiam) (quoting *Williams*, 529 U.S. at 405-06); *see also*, *Early v. Packer*, 537 U.S. 3, 8 (2002); *Bell*, 535 U.S. at 694.  "[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts' of petitioner's case." *Wiggins v. Smith*,

11

539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also*, *Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also*, *Williams*, 529 U.S. at 409. As the Supreme Court has explained, the standard for relief under § 2254(d) "is difficult to meet, [and] that is because it was meant to be." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). As the Court explained, "[s]ection 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice system,' not a substitute for ordinary error correction through appeal." *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring in the judgment)). Thus, "[a]s a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* at 786-87.

By its terms, § 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with "clearly established federal law as determined by the Supreme Court." Thus, "§ 2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence." *Williams*, 529 U.S. at 412. Further, the "phrase 'refers to the holdings, as opposed to the dicta, of [the] Court's decisions as of the time of the relevant state-court decision.' In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003) (citations omitted) (quoting *Williams*, 529

U.S. at 412).  The relevant "clearly established law" is the law that existed at the time of the last state court decision to issue a reasoned decision on the claim, *see Greene v. Fisher*, 132 S. Ct. 38, 44-45 (2011), and in evaluating the reasonableness of that decision a federal habeas court is limited to the record that was before the state court at the time of its decision, *see Cullen v. Pinholster*, 131 S. Ct. 1388, 1398-99 (2011).

Although "clearly established Federal law as determined by the Supreme Court" is the benchmark for habeas review of a state court decision, the standard set forth in § 2254(d) "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them."  *Early*, 537 U.S. at 8; *see also*, *Mitchell*, 540 U.S. at 16.  Further, although the requirements of "clearly established law" are to be determined solely by the holdings of the Supreme Court, the decisions of lower federal courts are useful in assessing the reasonableness of the state court's resolution of an issue.  *See Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003); *Phoenix v. Matesanz*, 233 F.3d 77, 83 n.3 (1st Cir. 2000); *Dickens v. Jones*, 203 F. Supp. 2d 354, 359 (E.D. Mich. 2002) (Tarnow, J.).

E.      *Trial Court Errors (Claim III)*

In his third claim, petitioner raises a hodgepodge of errors by the trial court that he claims denied him a fair trial.  Specifically, he contends that the trial court improperly admitted evidence, limited his cross-examination, and made inappropriate comments.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.[4]

---

[4]Because these claims were not adjudicated on the merits in the state courts, they are not subject to the deferential review set forth in § 2254(d).  I accordingly analyze them *de novo*.

13

1.      *Improper Admission of Evidence*

Petitioner first contends that the trial court improperly admitted as evidence a live .40 caliber bullet recovered from the crime scene.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

Unless a violation of a state's evidentiary rule results in the denial of fundamental fairness, an issue concerning the admissibility of evidence does not rise to the level of a constitutional violation.  *See Cooper v. Sowders*, 837 F.2d 284, 286 (6th Cir. 1988); *Davis v. Jabe*, 824 F.2d 483, 487 (6th Cir. 1987).  "[A] federal habeas court has nothing whatsoever to do with reviewing a state court ruling on the admissibility of evidence under state law.  State evidentiary law simply has no effect on [a court's] review of the constitutionality of a trial, unless it is asserted that the state law itself violates the Constitution."  *Pemberton v. Collins*, 991 F.2d 1218, 1223 (5th Cir. 1993).  As the Sixth Circuit has noted, "[e]rrors by a state court in the admission of evidence are not cognizable in habeas proceedings unless they so perniciously affect the prosecution of a criminal case as to deny the defendant the fundamental right to a fair trial."  *Kelly v. Withrow*, 25 F.3d 363, 370 (6th Cir. 1994); *see also, Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (federal habeas courts have no authority to interfere with perceived errors in state law unless the petitioner is denied fundamental fairness in the trial process).  In short, "[o]nly when the evidentiary ruling impinges on a specific constitutional protection or is so prejudicial that it amounts to a denial of due process may a federal court grant a habeas corpus remedy."  *Barrett v. Acevedo*, 169 F.3d 1155, 1163 (8th Cir. 1999); *see also*, *Coleman v. Mitchell*, 244 F.3d 533, 542 (6th Cir. 2001).  Where a specific constitutional right–such as the right to confront witnesses or to present a defense–is not implicated, federal habeas relief is available only if the allegedly erroneously admitted evidence "is almost totally unreliable

and . . . the factfinder and the adversary system will not be competent to uncover, recognize, and take due account of its shortcomings." *Barefoot v. Estelle*, 463 U.S. 880, 899 (1983).

Here, petitioner has failed to show how the admission of the bullet deprived him of a fair trial. The evidence technician testified that he recovered several spent shell casings as well as one live bullet from the scene. All of these, including the live bullet, were admitted into evidence. The bullet and casings recovered from the scene were clearly relevant, and petitioner has pointed to nothing to show that the evidence was so "totally unreliable" that the jury would be incompetent "to uncover, recognize, and take due account of its shortcomings." *Barefoot*, 463 U.S. at 899. Nor was there anything inherently prejudicial about the bullet. It was simply a bullet recovered from the scene. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

2.      *Limitation on Cross-Examination*

Petitioner next contends that he was denied his right to confront the witnesses when the trial court limited his examination of Kessa Tarver, the victim's sister. During counsel's examination of the witness, counsel asked if she had known her brother (Samuel) to carry a gun. The trial court sustained the prosecutor's objection to this question on the grounds of relevance, but defense counsel was permitted to ask the witness whether Samuel was carrying a gun on the day of the assault. *See* Trial Tr., dated 11/2/07, at 50-51. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

a. *Legal Standards*

Although the Constitution does not explicitly provide a criminal defendant with the right to "present a defense," the Sixth Amendment provides a defendant with the right to process to obtain

witnesses in his favor and to confront the witnesses against him, and the Fourteenth Amendment guarantees a defendant due process of law. Implicit in these provisions is the right to present a meaningful defense. As the Supreme Court has recognized, "[t]he right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense." *Washington v. Texas*, 388 U.S. 14, 19 (1967). "The right to compel a witness' presence in the courtroom could not protect the integrity of the adversary process if it did not embrace the right to have the witness' testimony heard by the trier of fact. The right to offer testimony is thus grounded in the Sixth Amendment." *Taylor v. Illinois*, 484 U.S. 400, 409 (1988). Further, the Court has noted that "[t]his right is a fundamental element of due process of law," *Washington*, 388 U.S. at 19, and that "[f]ew rights are more fundamental[.]" *Taylor*, 484 U.S. at 408. Although the right to present a defense is fundamental, it is not absolute. Thus, the right must yield to other constitutional rights, *see e.g.*, *United States v. Trejo-Zambrano*, 582 F.2d 460, 464 (9th Cir. 1978) ("The Sixth Amendment right of an accused to compulsory process to secure attendance of a witness does not include the right to compel the witness to waive his Fifth Amendment privilege."), or to other legitimate demands of the criminal justice system, *see United States v. Scheffer*, 523 U.S. 303, 308 (1998).

Further, to constitute a denial of the right to present a defense, a trial court's exclusion of evidence must "infringe[] upon a weighty interest of the accused." *Scheffer*, 523 U.S. at 308. A "weighty interest of the accused" is infringed where "the exclusion of evidence seriously undermined 'fundamental elements of the defendant's defense' against the crime charged." *Miskel v. Karnes*, 397 F.3d 446, 455 (6th Cir. 2005) (quoting *Scheffer*, 523 U.S. at 315). Thus, "'[w]hether the exclusion of [witnesses'] testimony violated [defendant's] right to present a defense depends

16

upon whether the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" *United States v. Blackwell*, 459 F.3d 739, 753 (6th Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting court).

The Supreme Court's "Confrontation Clause cases fall into two broad categories:  cases involving the admission of out-of-court statements and cases involving restrictions imposed by law or by the trial court on the scope of cross-examination." *Delaware v. Fensterer*, 474 U.S. 15, 18 (1985) (per curiam).  The latter category, which is implicated here, recognizes that "[c]onfrontation means more than being allowed to confront the witness physically." *Davis v. Alaska*, 415 U.S. 308, 315 (1974).  Thus, in cases where the trial court has restricted cross-examination in some manner, "the Court has recognized that Confrontation Clause questions will arise because such restrictions may 'effectively . . . emasculate the right of cross-examination itself.'" *Fensterer*, 474 U.S. at 19 (quoting *Smith v. Illinois*, 390 U.S. 129, 131 (1968)).

However, the Supreme Court has also explained that the Confrontation Clause does not "guarantee cross-examination that is effective in whatever way and to whatever extent the defense might wish." *Fensterer*, 474 U.S. at 20.  The question is whether the trial court's ruling allowed for "substantial compliance with the purposes behind the confrontation requirement," or, put another way, whether petitioner was "significantly limited in any way in the scope or nature of his cross-examination." *Green*, 399 U.S. at 166.  Thus, "[s]o long as cross-examination elicits adequate information to allow a jury to assess a witness's credibility, motives, or possible bias, the Sixth Amendment is not compromised by a limitation on cross-examination." *United States v. Cueto*, 151 F.3d 620, 638 (7th Cir. 1998); *see also*, *United States v. Larranaga*, 787 F.2d 489, 498 (10th Cir.

17

1986).  Further, even if a restriction on cross-examination amounts to a violation of the confrontation

right, such an error may be harmless.  *See  Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

### b.  Analysis

Here, petitioner cannot show that he was denied his right to confront the witness or to present

a defense by the trial court's restriction on counsel's questioning of Kessa Tarver.  Although Kessa

was not permitted to testify as to whether Samuel generally carried a gun, counsel was allowed to

question her regarding whether Samuel was carrying a gun on the day of the assault.  Further,

whether or not Samuel was carrying a gun was ultimately irrelevant.  Petitioner did not claim self-

defense; rather, he testified that Hook picked up the gun (that petitioner claimed fell from Samuel)

and fired the shots.  Kessa also was permitted to testify that petitioner was not carrying a gun on the

day of the assault.  In light of the nature of petitioner's defense, and the other testimony regarding

where the gun came from, petitioner cannot show that the trial court's restriction on the questioning

of Kessa deprived petitioner of his right to present a defense or to confront the witness.  That is, the

exclusion of this evidence did not "infringe upon a weighty interest of the accused," *Scheffer*, 523

U.S. at 308, by excluding evidence that, evaluated in the context of the entire record, "'creates a

reasonable doubt that did not otherwise exist.'"  *United States v. Blackwell*, 459 F.3d 739, 753 (6th

Cir. 2006) (quoting *Washington v. Schriver*, 255 F.3d 45, 47 (2d Cir. 2001)) (alterations by quoting

court).  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this

claim.

### 3.    *Improper Comments*

Petitioner next contends that he was denied a fair trial by improper comments made by the

trial judge.  The Court should conclude that petitioner is not entitled to habeas relief on this claim.

18

*a. Legal Standard*

Apart from judicial comments which show bias, a judge's comments will provide a ground for habeas relief only if the comments deprived the petitioner of a fair trial.  Unlike an appellate court on direct appeal, a federal habeas court does not exercise supervisory powers over the state courts, *see Murphy v. Florida*, 421 U.S. 794, 797 (1975), and thus a federal court's habeas jurisdiction is limited to correcting violations of federal constitutional law; it does not have the authority to correct perceived injustices absent a constitutional violation.  *See Guinan v. United States*, 6 F.3d 468, 470-71 (7th Cir. 1993); 28 U.S.C. § 2254(a) (emphasis added) (federal court has jurisdiction to entertain petition brought by state prisoner "*only* on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States.").[5]  As the Sixth Circuit has explained:

> Unless they amount to constitutional violations, prejudicial comments and conduct by a judge in a criminal trial are not proper subjects for collateral attack on a conviction.  In collateral proceedings, the test is whether the errors alleged could have rendered the trial fundamentally unfair.  To violate a defendant's right to a fair trial, a trial judge's intervention in the conduct of a criminal trial would have to reach a significant extent and be adverse to the defendant to a substantial degree.

*McBee v. Grant*, 763 F.2d 811, 818 (6th Cir. 1985) (internal quotations, citations, and alterations omitted).  Or as the Ninth Circuit has explained, on habeas review "the question is not simply whether the trial judge committed misconduct or whether [a federal appellate court] would reverse a conviction obtained after a trial in which a federal judge behaved in the same manner.  Rather, we must ask whether the state trial judge's behavior rendered the trial so fundamentally unfair as to

---

[5]In contrast, a federal court may use its supervisory powers over lower federal courts and federal prosecutors to correct injustices.  *See United States v. Leslie*, 783 F.2d 541, 569-70 (5th Cir. 1986) (en banc) (Williams, J., dissenting), *vacated*, 479 U.S. 1074 (1987); *United States v. Crawford*, 466 F.2d 1155, 1157 (10th Cir. 1972).

violate federal due process under the United States Constitution." *Duckett v. Godinez*, 67 F.3d 734, 740 (9th Cir. 1995); *accord Harrington v. Iowa*, 109 F.3d 1275, 1280 (8th Cir. 1997).  In other words, to warrant habeas relief "there must be an 'extremely high level of interference' by the trial judge which creates 'a pervasive climate of partiality and unfairness.'" *Duckett*, 67 F.3d at 740 (quoting *United States v. DeLuca*, 692 F.2d 1277, 1282 (9th Cir. 1982)).

### *b.  Analysis*

Petitioner's judicial misconduct claim is based on two statements made by the trial judge. First, petitioner claims that the trial judge improperly called him a "marksman."  The comment to which petitioner refers did not deprive him of a fair trial, for two reasons.  First, the trial court did not call petitioner a marksman.  Petitioner, through counsel, moved for a directed verdict of acquittal, arguing that because Samuel Tarver was shot only in the legs as he ran away, there was no evidence that petitioner intended to kill him.  The trial court rejected this argument, stating:

> Am I to assume that with the defendant's motion that Mr. Wiggins is a marksman with a pistol or handgun because ostensibly that's what the motion is assuming; that it wasn't the intention of Mr. Wiggins to slay Mr. Tarver but was only shooting his legs out from underneath him.
>
> Maybe Mr. Wiggins is a better shot than this Court but, when the evidence is viewed in the light most favorable to the prosecution, this motion for directed verdict doesn't have a leg to stand on so to speak.

Trial Tr., dated 11/2/07, at 15-16.  Thus, it is clear that the trial court was not calling petitioner a marksman, but was saying that that was the import of petitioner's own argument, an import that the trial court in fact rejected.  In any event, petitioner cannot show that this comment deprived him of a fair trial, because the jury had been excused for the argument on the directed verdict motion, *see id*. at 13, and thus the jury was not exposed to the comment. "[C]omments by the judge in the absence of the jury . . . provide no basis for reversal." *United States v. Rolda-Zapata*, 916 F.2d 795,

807 (2d Cir. 1990); *see also*, *United States v. Palma*, 511 F.3d 1311, 1317 (11th Cir. 2008).

Petitioner also contends that he was denied a fair trial by the judge's statement that Malcolm Tarver's testimony was not inconsistent with his prior preliminary examination testimony.  During cross-examination of Malcolm, the following exchange occurred:

> Q.      You stated in court today you believe you were hit with the gun two times?
>
> A.      No.  I said three.
>
> Q.      You never said two or three?
>
> A.      Two or three.
>
> Q.      Two or three.  Fair enough.
> Do you remember being asked the question at preliminary examination:
> How many times did he hit?  Referring to Mr. Wiggins and the gun.
> And the answer being twice.
> Do you remember being asked that question and giving that answer?

Trial Tr., dated 11/1/07, at 41.  The prosecutor objected to the form of counsel's impeachment, arguing that Malcolm "already told two to three times.  He said twice.  It is not proper impeachment. It is not an inconsistent statement."  *Id*.  The trial court sustained the objection, explaining: "I don't see any inconsistency someone [sic] in the testimony."  *Id*.  Petitioner contends that he was denied a fair trial by the judge's comment that Malcolm's statement was not inconsistent.  However, the trial judge's statement was made in making a proper ruling on defense counsel's attempt to impeach Malcolm with a prior statement that was not inconsistent with his trial testimony.  There was simply no inconsistency between Malcolm's trial testimony that he was hit with the gun "two or three" times, and his prior testimony that he was hit twice.  Contrary to the import of petitioner's argument, the trial court did not suggest that there were no inconsistencies between Malcolm's trial testimony

21

and prior statements or testimony; rather, the court merely ruled that there was no inconsistency on this one matter. Thus, the comment was not improper. And even if the comment was improper, petitioner was not denied a fair trial because it was not "substantially adverse to the defendant himself," and "[t]here is no showing that the trial judge ever intimated his opinion on the merits of the case." *Todd v. Stegal*, 40 Fed. Appx. 25, 27 (6th Cir. 2002). Further, the comment was a single, isolated statementl. Habeas relief generally is not appropriate based on a few improper comments during the course of a long trial. *See United States v. Saenz*, 134 F.3d 697, 702 (5th Cir. 1998); *Harrington*, 109 F.3d at 1280; *cf. United States v. Bermea*, 30 F.3d 1539, 1569 (5th Cir. 1994) (trial not rendered fundamentally unfair by trial judge's comments unless the judge's intervention was "quantitatively and qualitatively substantial."). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

F.   *Prosecutorial Misconduct (Claim IV)*

Petitioner next contends that he was denied a fair trial by improper comments made by the prosecutor. The Court should conclude that petitioner is not entitled to habeas relief on this claim.

1.   *Legal Standard*

For habeas relief to be warranted on the basis of prosecutorial misconduct, it is not enough that the prosecutor's conduct was "undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). Rather, the misconduct must have "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.* (internal quotation omitted). *Darden* constitutes "[t]he 'clearly established Federal law' relevant" to a prosecutorial misconduct claim. *Parker v. Matthews*, 132 S. Ct. 2148, 2153 (2012) (per curiam). "[T]he touchstone of due process analysis . . . is the fairness of the trial, not the culpability of the

prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "[T]he *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case-determinations.'" *Parker*, 132 S. Ct. at 2155 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In reviewing whether prosecutorial comments deprived a defendant of a fair trial, a court may not consider the remarks in isolation, but must consider the remarks in the context of the entire trial, including the prosecutor's appropriate comments, the court's instructions to the jury, and the evidence presented in the case. *See Brown v. Payton*, 544 U.S. 133, 144 (2005); *United States v. Young*, 470 U.S. 1, 11 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 636, 645 (1974). Even where, as here, AEDPA deference does not apply, "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone." *Young*, 470 U.S. at 11.

   2.   *Analysis*

   Petitioner contends that the prosecutor committed misconduct by stating several times during closing argument that petitioner chased Samuel Tarver down the street and continued shooting at him, evidencing an intent to murder Samuel. This argument, however, was based on the evidence. At trial, the evidence technician testified that some casings were found in front of petitioner's home, and that several more casings were recovered 40-50 feet down the street, with all the casings covering a 60 foot radius. *See* Trial Tr., dated 11/1/07, at 71-72, 77-78. The prosecutor's argument was directly tied to this evidence. *See id*., dated 11/2/07, at 116, 118, 144. It is true, as petitioner argues, that there was no direct evidence that the shells recovered further down the street came from the same gun as the shells recovered from in front of petitioner's home, but in light of the testimony of the witnesses, this was a fair inference. And it was an equally fair inference that the location of the shells supported a finding that petitioner continued to pursue Samuel as petitioner was shooting

him.  A prosecutor is free to argue fair inference from the record.  *See, e.g.*, *Nichols v. Scott*, 69 F.3d 1255, 1283 (5th Cir. 1995) (comment "is permissible to the extent that it draws a conclusion based solely on the evidence presented.") (internal quotation omitted); *United States v. Grey Bear*, 883 F.2d 1382, 1392 (8th Cir. 1989); *Martin v. Foltz*, 773 F.2d 711, 717 (6th Cir. 1985) (prosecutor may argue permissible inferences from the evidence).

Petitioner next contends that the prosecutor committed misconduct by asking Malcolm Tarver, "You told us that he hit you in the head three times."  Trial Tr., dated 11/1/07, at 18. Petitioner contends that this question misstated Malcolm's testimony from the preliminary examination.  Petitioner cannot show, however, that the prosecutor's question improperly misstated the evidence, however.  Malcolm responded "yes" to the question, and thus testified that he was indeed struck three times with the gun.  Earlier, Malcolm had testified that petitioner hit him in the head "two or three times," *id*. at 11, which was not necessarily inconsistent with his later testimony that he was struck three times.  And at the preliminary examination Malcolm did not testify that he was hit only two times; rather, he testified that he was hit "about twice," Prelim. Exam. Tr., at 34, which again was not necessarily inconsistent with his testimony that he was struck three times.  In any event, whether he was struck three times or only twice had only marginal relevance.  Malcolm testified that petitioner struck him more than once with the gun, and that the gun discharged multiple times as he was doing so.  Petitioner has failed to show how the prosecutor's question deprived him of a fair trial.

Petitioner next contends that the prosecutor committed misconduct when he stated that petitioner left the neighborhood for two days because he knew he had killed Samuel.  *See* Trial Tr., dated 11/2/07, at 139.  This comment, however, was based on the evidence that petitioner did indeed

24

leave the neighborhood after the shooting.  "It is well established in Michigan law that evidence of flight is admissible.  Such evidence is probative because it may indicate consciousness of guilt, although evidence of flight by itself is insufficient to sustain a conviction. The term 'flight' has been applied to such actions as fleeing the scene of the crime, leaving the jurisdiction, running from the police, resisting arrest, and attempting to escape custody." *People v. Coleman*, 210 Mich. App. 1, 4, 532 N.W.2d 885, 887 (1995).  Here, the evidence of flight was properly admitted, and the prosecutor was free to argue that the evidence of flight demonstrated petitioner's consciousness of his guilt.  Thus, the prosecutor's comment was not improper.

Finally, petitioner contends that the prosecutor committed misconduct by repeatedly referring to Samuel Tarver's death, which was unrelated to the events at issue in his trial.  During opening statement, the prosecutor explained to the jury that Samuel was murdered shortly after the preliminary examination, and therefore the jury would not see him testify, but would only hear his preliminary examination testimony.  *See* Trial Tr., dated 10/31/07, at 136.  On direct examination of Malcolm Tarver, the prosecutor asked Malcolm to confirm that Samuel was deceased.  *See id.*, dated 11/1/07, at 26.  Upon direct examination of Samuel and Malcolm's mother, the prosecutor expressed his condolences to Mrs. Tarver.  *See id.*, dated 11/2/07, at 100.  Finally, on rebuttal argument, the prosecutor argued that Tianna's testimony was not credible because she herself had said that she did not care about Samuel any more because he was dead.  *See id.* at 137.  Petitioner cannot show that these comments deprived him of a fair trial.  It was necessary to inform the jury of Samuel's death to explain why he was not testifying at trial.  At no point did the prosecutor suggest that petitioner was in any way responsible for Samuel's death, nor that the death was related to the assault committed by petitioner.  The comment made during closing argument was an accurate

25

reflection of the evidence, and thus was permissible.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on his prosecutorial misconduct claims.

G.      *Ineffective Assistance of Counsel (Claims I & II)*

Finally, petitioner raises several ineffective assistance of counsel claims.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

1.      *Clearly Established Law*

The Sixth Amendment right to counsel and the right to effective assistance of counsel protect the fundamental right to a fair trial.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).  To establish the ineffective assistance of counsel, petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Id*. at 687.  These two components are mixed  questions of law and fact.  *Id*. at 698.  Further, "[t]here is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."  *Id.* at 697.  If "it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed."  *Id.*  With respect to the performance prong of the *Strickland* test, a strong presumption exists that counsel's behavior lies within the wide range of reasonable professional assistance. *See id*.  at 689; *see also O'Hara v. Wigginton*, 24 F.3d 823, 828 (6th Cir. 1994).  "[D]efendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland*, 466 U.S. at 689 (citation omitted).  "[T]he court should recognize that counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Id*. at 690.  With respect to the

26

prejudice prong, the reviewing court must determine, based on the totality of the evidence before

the factfinder, "whether there is a reasonable probability that, absent the errors, the factfinder would

have had a reasonable doubt respecting guilt." *Id.* at 695.  It is petitioner's burden to establish the

elements of his ineffective assistance of counsel claim.  *See United States v. Pierce*, 63 F.3d 818,

833 (6th Cir. 1995) (petitioner bears the burden of establishing counsel's ineffectiveness); *Lewis v.*

*Alexander*, 11 F.3d 1349, 1352 (6th Cir. 1993) (same).

　　　As the Supreme Court has recently explained, *Strickland* establishes a high burden that is

difficult to meet, made more so when the deference required by § 2254(d)(1) is applied to review

a state court's application of *Strickland*:

> "Surmounting Strickland's high bar is never an easy task." *Padilla v.*
> *Kentucky*, 559 U.S. ----, ----, 130 S.Ct. 1473, 1485, 176 L.Ed.2d 284 (2010). An
> ineffective-assistance claim can function as a way to escape rules of waiver and
> forfeiture and raise issues not presented at trial, and so the Strickland standard must
> be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the
> integrity of the very adversary process the right to counsel is meant to serve.
> *Strickland*, 466 U.S., at 689-690, 104 S.Ct. 2052. Even under *de novo* review, the
> standard for judging counsel's representation is a most deferential one. Unlike a later
> reviewing court, the attorney observed the relevant proceedings, knew of materials
> outside the record, and interacted with the client, with opposing counsel, and with
> the judge. It is "all too tempting" to "second-guess counsel's assistance after
> conviction or adverse sentence." *Id.*, at 689, 104 S.Ct. 2052; *see also Bell v. Cone*,
> 535 U.S. 685, 702, 122 S.Ct. 1843, 152 L.Ed.2d 914 (2002); *Lockhart v. Fretwell*,
> 506 U.S. 364, 372, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). The question is whether
> an attorney's representation amounted to incompetence under "prevailing
> professional norms," not whether it deviated from best practices or most common
> custom. *Strickland*, 466 U.S., at 690, 104 S.Ct. 2052.
> 　　　Establishing that a state court's application of *Strickland* was unreasonable
> under § 2254(d) is all the more difficult. The standards created by *Strickland* and §
> 2254(d) are both "highly deferential," *id.*, at 689, 104 S.Ct. 2052; *Lindh v. Murphy*,
> 521 U.S. 320, 333, n. 7, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997), and when the two
> apply in tandem, review is "doubly" so, *Knowles*, 556 U.S., at ----, 129 S.Ct. at 1420.
> The *Strickland* standard is a general one, so the range of reasonable applications is
> substantial. 556 U.S., at ----, 129 S.Ct. at 1420 . Federal habeas courts must guard
> against the danger of equating unreasonableness under *Strickland* with
> unreasonableness under § 2254(d). When § 2254(d) applies, the question is not

whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

*Harrington v. Richter*, 131 S. Ct. 770, 788 (2011).[6]

With respect to appellate counsel, it is well established that "appellate counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal." *Smith v. Robbins*, 528 U.S. 259, 288 (2000) (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). Although it is "possible to bring a *Strickland* claim based on counsel's failure to raise a particular claim, . . . it is difficult to demonstrate that counsel was incompetent." *Id*. As a general rule, it is "'only when ignored issues are clearly stronger than those presented [that] the presumption of effective assistance of counsel [can] be overcome.'" *Id*. (quoting *Gray v. Greer*, 800 F.2d 644, 646 (7th Cir. 1986)). Further, in the appellate counsel context, to demonstrate prejudice petitioner must show a reasonable probability that his claims would have succeeded on appeal. *See id*. at 285-86; *Benning v. Warden*, 345 Fed. Appx. 149, 155-56 (6th Cir. 2009); *McCleese v. United States*, 75 F.3d 1174, 1180 (7th Cir. 1996).

2.   *Trial Counsel*

Petitioner contends that trial counsel was ineffective for failing to: (1) properly impeach Malcolm Tarver with his prior inconsistent statements; (2) object to the prosecutor's use of leading questions during the examination of Malcolm; and (3) object to the prosecutor's misconduct. The Court should conclude that petitioner is not entitled to habeas relief on these claims.

---

[6]Although the trial court determined that this claims were barred by petitioner's failure to raise them on direct appeal, the AEDPA standard is still applicable. Notwithstanding the trial court's application of a procedural bar, the trial court also considered the merits of petitioner's ineffective assistance claims in the alternative. Where a state court addresses the merits as an alternative ground for decision notwithstanding its application of a procedural bar, the adjudication is considered "on the merits" and is entitled to deference under the AEPA. *See Brooks v. Bagley*, 513 F.3d 618, 624-25 (6th Cir. 2008); *see also*, *Rolan v. Coleman*, 680 F.3d 311, 319-20 (3d Cir. 2012) (citing cases).

### a.  Impeachment

Petitioner contends that counsel should have impeached Malcolm Tarver with his prior statements to the police.  "[C]ourts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel." *Dell v. Straub,* 194 F. Supp. 2d 629, 651 (E.D. Mich. 2002) (Friedman, J.); *see Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001); *Dows v. Wood*, 211 F.3d 480, 489 (9th Cir. 2000).  "Impeachment strategy is a matter of trial tactics, and tactical decisions are not ineffective assistance of counsel simply because in retrospect better tactics may have been available." *Dell*, 194 F. Supp. 2d at 1219; *accord Millender v. Adams*, 187 F. Supp. 2d 852, 872 (E.D. Mich. 2002) (Rosen, J.).  The mere fact that other avenues of impeachment may have existed does not render counsel ineffective; counsel need not "develop every bit of testimony through all available inconsistent statements." *Poyner v. Iowa*, 990 F.2d 435, 438 (8th Cir. 1993); *see also*, *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (internal quotation omitted) (counsel not ineffective even though "other testimony might have been elicited from those who testified."); *United States v. Kozinski*, 16 F.3d 795, 817 (7th Cir. 1994) (counsel not ineffective where counsel could have elicited additional impeachment information on cross-examination). Here, counsel impeached Malcolm extensively throughout his cross-examination.  The mere fact that counsel failed to pursue every possible avenue of impeachment is insufficient to show that counsel was ineffective.  Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### b.  Leading Questions

Petitioner also contends that counsel was ineffective for failing to object to the prosecutor's leading questions to Malcolm.  However, petitioner has not identified the particular questions which

29

he claims were leading, alleging only a general claim that the prosecutor asked leading questions. Conclusory allegations, without more, do not provide a basis for habeas relief. *See Workman v. Bell*, 160 F.3d 276, 287 (6th Cir. 1998). Rather, to be entitled to habeas relief a petitioner must identify with particularity the questions or testimony to which his counsel should have objected. *Cf. Avincola v. Stinson*, 60 F. Supp. 2d 133, 161 (S.D.N.Y. 1999) (petitioner claiming that prosecutor made improper comments must identify particular statements which he contends were improper). Nor has petitioner explained how he was prejudiced by the prosecutor's allegedly leading questions. Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### c. Prosecutorial Misconduct

Petitioner also contends that trial counsel was ineffective for failing to object to the prosecutor's misconduct. As explained above, the prosecutor did not commit misconduct that deprived petitioner of a fair trial. Because petitioner cannot show that the prosecutor's comments deprived him of a fair trial, he likewise cannot show that he was prejudiced by counsel's failure to object. *See White v. Withrow*, No. 00-CV-74231, 2001 WL 902624, at *12 (E.D. Mich. June 22, 2001) (Rosen, J.) (citing *United States v. Nwankwo*, 2 F. Supp. 2d 765, 770 (D. Md. 1998)) (no prejudice from counsel's failure to object to prosecutorial misconduct where prosecutor's comments did not deprive petitioner of a fair trial); *Rich v. Curtis*, No. 99-CV-73363, 2000 WL 1772628, at *8 (E.D. Mich. Oct. 24, 2000) (Friedman, J.) (same). Accordingly, the Court should conclude that petitioner is not entitled to habeas relief on this claim.

### 3. Appellate Counsel

Petitioner also claims that appellate counsel was ineffective for failing to: (1) challenge the sufficiency of the evidence with respect to the assault with intent to commit murder conviction; (2)

raise a claim relating to the court's instruction on assault with intent to commit great bodily harm as a lesser included offense of assault with intent to commit murder; and (3) raise a claim on appeal challenging trial counsel's assistance.  The Court should conclude that petitioner is not entitled to habeas relief on these claims.

### a.  Sufficiency of the Evidence

Petitioner first contends that there was insufficient evidence to sustain his assault with intent to commit murder conviction, and thus that appellate counsel was ineffective for failing to raise this claim on direct appeal.  Because petitioner cannot show that the evidence was insufficient, he cannot show that counsel was ineffective for failing to raise this claim on direct appeal.

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In Re Winship*, 397 U.S. 358, 364 (1970).  Under the pre-AEDPA standard for habeas review of sufficiency of the evidence challenges, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original).  Reviewing courts must view the evidence, draw inferences and resolve conflicting inferences from the record in favor of the prosecution.  "[I]t is the responsibility of the [factfinder]–not the [reviewing] court–to decide what conclusions should be drawn from the evidence admitted at trial." *Cavazos v. Smith*, 565 U.S. 1, ___, 132 S. Ct. 2, 4 (2011) (per curiam).  The *Jackson* standard "leaves [factfinders] broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that [the factfinder] 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132

S. Ct. 2060, 2064 (2012) (per curiam) (quoting *Jackson*, 443 U.S. at 319).  Likewise, a reviewing

court "do[es] not make credibility determinations in evaluating the sufficiency of the evidence."

*United State v. Owusu*, 199 F.3d 329, 344 (6th Cir. 2000); *see also*, *United States v. Bailey*, 444 U.S.

394, 424-25 (1980) ("It is for [jurors] and not for appellate courts to say that a particular witness

spoke the truth or fabricated a cock-and-bull story.").  It is the job of the factfinder, not this Court

sitting on habeas review, to resolve conflicts in the evidence, and this Court must presume that the

jury resolved those conflicts in favor of the prosecution.  *See Jackson*, 443 U.S. at 326.  As the Court

has explained, "the only question under *Jackson* is whether [the finding] was so insupportable as to

fall below the threshold of bare rationality."  *Coleman*, 132 S. Ct. at 2065.

Michigan law provides that "[a]ny person who shall assault another with intent to commit

the crime of murder, shall be guilty of a felony[.]" MICH. COMP. LAWS § 750.83.  Under this

provision, "the crime of assault with intent to commit murder requires proof of three elements: '(1)

an assault, (2) with an actual intent to kill, (3) which, if successful, would make the killing murder.'"

*Warren v. Smith*, 161 F.3d 358, 361 (6th Cir. 1998) (quoting *People v. Plummer*, 229 Mich. App.

293, 581 N.W.2d 753, 759 (1998); *People v. Hoffman*, 225 Mich. App. 103, 570 N.W.2d 146, 150

(1997)).  As with other mental-state elements, intent to kill need not be proved by direct evidence,

but rather may be proved by circumstantial evidence and reasonable inferences drawn from the

evidence.  *See Warren*, 161 F.3d at 360; *Hoffman*, 225 Mich. App. at 111, 570 N.W.2d at 150.

In his preliminary examination testimony, which was introduced at trial, Samuel Tarver

testified that when he attempted to stop petitioner from assaulting his brother, petitioner turned the

gun and pointed it straight at him.  *See* Prelim. Exam. Tr., at 15.  He ran, and immediately after he

started to run he was shot.  *See id*. at 15-16.  Malcolm Tarver testified at trial that petitioner pointed

the gun at Samuel.  *See* Trial Tr., dated 11/1/07, at 14.  Petitioner's act of firing a gun at Samuel

multiple times and at close range is sufficient evidence from which the finder of fact could infer

beyond a reasonable doubt that petitioner intended to kill the victim.  *See Johnigan v. Elo*, 207 F.

Supp. 2d 599, 608 (E.D. Mich. 2002) (Steeh, J.); *People v. Ritsema*, 105 Mich. App. 602, 609, 307

N.W.2d 380, 383 (1981); *People v. Johnson*, 54 Mich. App. 303, 304, 220 N.W.2d 705, 706 (1974).

Petitioner notes that Samuel testified at the preliminary examination that, at the time the shots were

fired, his back was to petitioner and he did not actually see the shots fired.  However, the shots

followed in quick succession after he turned his back, and both Samuel and Malcolm testified that

petitioner had pointed his gun at Samuel immediately before Samuel turned his back.  Thus, a jury

could conclude beyond a reasonable doubt that petitioner was deliberately aiming at Samuel at the

time he fired the shots.  In light of Samuel's and Malcolm's testimony, the verdict was not "so

insupportable as to fall below the threshold of bare rationality."  *Coleman*, 132 S. Ct. at 2065.  And

because petitioner's sufficiency of the evidence claim is without merit, he cannot show that appellate

counsel was ineffective for failing to raise the claim on direct appeal.

### b.  *Jury Instructions*

Petitioner next claims that appellate counsel was ineffective for failing to raise a challenge

to the trial court's jury instructions.  Specifically, he contends that the trial court failed to properly

explain to the jury that assault with intent to commit great bodily harm is a lesser offense of assault

with intent to commit murder.  While it is true that the trial court did not specifically instruct the jury

that assault with intent to commit great bodily harm is a lesser included offense, the jury was

instructed on the elements of that offense because petitioner was charged with both offenses as to

Samuel Tarver.  Thus, under the instructions given by the trial court, petitioner could have been

found guilty of assault with intent to commit great bodily harm with respect to Samuel, and acquitted of assault with intent to commit murder with respect to Samuel.  Petitioner does not contend that there was any error in either instruction, and the record does not reveal any such error.  Thus, the instructions as given accurately reflected the charges against petitioner, including the lesser included offense of assault with intent to commit great bodily harm with respect to Samuel, and any error in failing to explicitly state that assault with intent to commit great bodily harm was a lesser included offense of assault with intent to commit murder would not have provided a basis for reversal of petitioner's conviction.  *See United States v. Arias-Izquierdo*, 449 F.3d 1168, 1185-86 (11th Cir. 2006); *cf. United States v. Whitfield*, 695 F.3d 288, 304 (4th Cir. 2012); *Williams v. Horel*, No. C 08-5340, 2010 WL 4939313, at *5 (N.D. Cal. Nov. 29, 2010).  Accordingly, counsel was not ineffective for failing to raise this claim on direct appeal.

### c. Ineffective Assistance of Trial Counsel

Finally, petitioner contends that appellate counsel was ineffective for failing to raise his ineffective assistance of trial counsel claims on direct appeal.  As explained above, however, petitioner's trial counsel claims are without merit.  Thus, petitioner cannot show that appellate counsel was ineffective for failing to raise these meritless claims on direct appeal, and petitioner is not entitled to habeas relief on this claim.

H.    *Recommendation Regarding Certificate of Appealability*

1.    *Legal Standard*

As amended by the Antiterrorism and Effective Death Penalty Act, section 2253 provides that a petitioner may not appeal a denial of an application for a writ of habeas corpus unless a judge issues a certificate of appealability.  *See* 28 U.S.C. § 2253(c)(1).  The statute further provides that

34

"[a] certificate of appealability may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). As the Sixth Circuit has noted, this language represents a codification of the Supreme Court's decision in *Barefoot v. Estelle*, 463 U.S. 880 (1983), and "[t]he AEDPA thus makes no change to the general showing required to obtain a certificate[.]" *Lyons v. Ohio Adult Parole Auth.*, 105 F.3d 1063, 1073 (6th Cir. 1997); *accord Slack v. McDaniel*, 529 U.S. 473, 483 (2000). Although the statute does not define what constitutes a "substantial showing" of a denial of a constitutional right, the burden on the petitioner is obviously less than the burden for establishing entitlement to the writ; otherwise, a certificate could never issue. Rather, the courts that have considered the issue have concluded that "'[a] substantial showing requires the applicant to "demonstrate that the issues are debatable among jurists of reason; that a court could resolve the issues (in a different manner); or that the questions are adequate to deserve encouragement to proceed further."'" *Hicks v. Johnson*, 186 F.3d 634, 636 (5th Cir. 1999) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 755 (5th Cir. 1996) (quoting *Barefoot*, 463 U.S. at 893 n.4)); *accord Slack*, 529 U.S. at 483-84. Although the substantive standard is the same, "[t]he new Act does, however, require that certificates of appealability, unlike the former certificates of probable cause, specify which issues are appealable." *Lyons*, 105 F.3d at 1073. (citing 28 U.S.C. § 2253(c)(3)).

Effective December 1, 2009, the newly created Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, 28 U.S.C. foll. § 2254, provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rule 11(a), 28 U.S.C. foll. § 2254. The rule tracks § 2253(c)(3)'s requirement that any grant of a certificate of appealability "state the specific issue or issues that satisfy the showing required by §

35

2253(c)(2)," Rule 11(a), but omits the requirement contained in the pre-amendment version of Federal Rule of Appellate Procedure 22(b)(1) that the court explain "why a certificate should not issue." FED. R. APP. P. 22(b)(1) (version effective prior to 2009 amendment); *see id.*, advisory committee note, 2009 amendments. In light of the new Rule 11 requirement that the Court either grant or deny the certificate of appealability at the time of its final adverse order, I include a recommendation regarding the certificate of appealability issue here.

2.    *Analysis*

If the Court accepts my recommendation regarding the merits of petitioner's claims, the Court should also conclude that petitioner is not entitled to a certificate of appealability. Because it is clear that errors of state evidence law provide no basis for habeas relief, the resolution of petitioner's evidentiary claim is not reasonably debatable. Further, it is clear from the record that petitioner was able to adequately explore the issue of whether he or Samuel Tarver were armed at the time the confrontation began, and thus the conclusion that petitioner was not denied his right to confront the witnesses or present a defense is not reasonably debatable. Because the trial judge's comments were either not made in front of the jury or were merely a proper ruling on an evidentiary objection that expressed no opinion on the merits of the case, the resolution of petitioner's judicial misconduct claim is likewise not reasonably debatable. As explained above, each of the prosecutor's comments was a fair inference based on the evidence presented at trial, and thus the resolution of petitioner's prosecutorial misconduct claims is not reasonably debatable. It likewise follows that the resolution of petitioner's ineffective assistance of trial counsel claim based on counsel's failure to object to the alleged prosecutorial misconduct is not reasonably debatable. In light of the fact that cross-examination is particularly committed to counsel's professional judgment

36

and counsel extensively impeached Malcolm Tarver during cross-examination, the resolution of petitioner's claim that counsel was ineffective for failing to impeach Malcolm in other ways is not reasonably debatable. And because petitioner has failed to identify any specific leading questions to which counsel should have objected, the resolution of this claim is not reasonably debatable. Finally, because it is clear that the prosecution presented sufficient evidence to prove petitioner's guilt beyond a reasonable doubt, that the jury instructions adequately explained the charges, and that petitioner's ineffective assistance of trial counsel claims are meritless, the resolution of petitioner's ineffective assistance of appellate counsel claims is not reasonably debatable. Accordingly, the Court should conclude that petitioner is not entitled to a certificate of appealability.

I.   *Conclusion*

In view of the foregoing, the Court should conclude that the state courts' resolution of petitioner's claims did not result in a decision which was contrary to, or which involved an unreasonable application of, clearly established federal law. Accordingly, the Court should deny petitioner's application for the writ of habeas corpus. If the Court accepts this recommendation, the Court should also deny petitioner a certificate of appealability.

III.   NOTICE TO PARTIES REGARDING OBJECTIONS:

The parties to this action may object to and seek review of this Report and Recommendation, but are required to act within fourteen (14) days of service of a copy hereof as provided for in FED. R. CIV. P. 72(b)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Secretary of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the

objections a party might have to this Report and Recommendation. *See Willis v. Secretary of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991). *Smith v. Detroit Federation of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.


_s/ Paul J. Komives_____
PAUL J. KOMIVES
UNITED STATES MAGISTRATE JUDGE

Dated: ____9/5/13_____


## CERTIFICATION OF SERVICE

I hereby certify that a copy of this Order was mailed to Petitioner and Counsel of Record on September 5, 2013.


_s/  Carol J. Bethel_____
Case Manager

38